**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**GALVESTON DIVISION**

| | | |
|---|---|---|
| OPREX SURGERY (BAYTOWN) L.P., | § | |
| OPREX SURGERY (BEAUMONT), L.P., | § | |
| OPREX SURGERY (HOUSTON), L.P., | § | |
|        Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. _____ |
| | § | |
| AIR PRODUCTS AND CHEMICALS, INC.; | § | |
| AIR PRODUCTS MEDICAL PLAN, | § | |
|        Defendants. | § | |

**ORIGINAL COMPLAINT**

Plaintiffs Oprex Surgery (Baytown), L.P, Oprex Surgery (Beaumont), L.P., and Oprex Surgery (Houston), L.P., (collectively referred to as "Plaintiffs"), files this Original Complaint complaining of and about Defendants Air Products and Chemicals, Inc. and Air Products Medical Plan (collectively referred to as "Defendants""), and for causes of action would respectfully show the following:

**I. PARTIES**

1.       Plaintiff Oprex Surgery (Baytown), L.P. is a limited partnership in good standing that was created pursuant to the laws of the State of Texas on or about July 1, 2009. Plaintiff is the lawful assignee of certain underlying healthcare claims forming the basis for this civil action.

2.       Plaintiff Oprex Surgery (Beaumont), L.P. is a limited partnership in good standing that was created pursuant to the laws of the State of Texas on or about April 24, 2006. Plaintiff is the lawful assignee of certain underlying healthcare claims forming the basis for this civil action.

3.       Plaintiff Oprex Surgery (Houston), L.P. is a limited partnership in good standing that was created pursuant to the laws of the State of Texas on or about September 3, 2008. Plaintiff is the lawful assignee of certain underlying healthcare claims forming the basis for this civil action.

4.       Defendants Air Products and Chemicals, Inc., ("Air Products") is a foreign corporation with its corporate headquarters located at 7201 Hamilton Boulevard, Allentown, PA 18195. Air

Products also has facilities in and around Houston, Texas. During all material times, Air Products acted as the Plan Sponsor and Plan Administrator for the Air Products Medical Plan (the "Plan"). Defendant Air Products may be served by serving its registered agent for service of legal process: CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

5.      The Plan is a self-funded welfare benefits plan governed by ERISA. The Plan may be served by serving its Plan Administrator's registered agent for service of legal process: CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

## II. JURISDICTION AND VENUE

6.      This Court has personal jurisdiction over Defendants because Defendants conduct substantial business in Texas, and because a substantial part of the events or omissions giving rise to the claims alleged herein occurred here.

7.      The Court has subject matter jurisdiction over this action pursuant to 29 U.S.C. §§ 1001 et seq., Employment Retirement Income Security Act ("ERISA"), as Plaintiffs' claims, in part, arise under ERISA. The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution, law or treaties of the United States.

8.      The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because this is an action between citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

9.      This Court has supplemental jurisdiction over Plaintiffs' non-ERISA claims pursuant to 28 U.S.C. § 1367, as those claims are so related to claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

10.      Venue is properly established in this Court pursuant to 28 U.S.C. § 1391(b)(2) because all or a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this judicial district. Specifically, and without limitation, the following events and omissions giving

rise to the claims asserted herein occurred in this judicial district: the collection and contributions of premiums for the Plan, the making of promises and representations regarding covered medical benefits of Plan members and beneficiaries who work and reside in this district, the provision of health care services to Plan beneficiaries, the filing of claims and claim appeals to the Plan, the exchange of correspondence relating to those claims appeals, and the decision-making by Plan fiduciaries relating to the disposition of Plan funds.

11.     Venue is properly established in this Court pursuant to 29 U.S.C. § 1132(e)(2) because this action has been brought in the district where the Plan is administered, where the breaches alleged herein took place, or where a Defendants resides or may be found.

### III.  CONDITIONS PRECEDENT

12.     All conditions precedent to filing this lawsuit have been met. Pursuant to 29 C.F.R. § 2560.503-1(1), "the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted all administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim."

### IV.  FACTUAL ALLEGATIONS

**A.     Overview of Self-Funded Healthcare Plans Governed by ERISA**

13.     In the United States, individuals not eligible for Medicare or Medicaid typically obtain health insurance coverage through their employer, or through a family member's employer. These employers typically provide health insurance on either a fully-insured or self-funded basis.

14.     When an employer provides health insurance on a fully-insured basis, the employer contracts with the insurance company for the insurance company to pay the medical claims using its

own funds. In exchange, the insurance company receives premiums while it assumes the financial risk for the covered members and beneficiary's medical costs.

15.     By contrast, in a self-funded plan, the employer assumes the financial risk for covered members beneficiary's medical costs. The employer forms a specific fund for the purpose of paying these healthcare benefits, and the costs and expenses of the health care claims of the covered members and beneficiaries are paid from the fund. This fund is traditionally and typically made up of funds provided primarily from employees in the form of monthly premiums. Employers will routinely obtain stop loss insurance to provide a financial safeguard against catastrophic plan costs during the plan's fiscal year. This stop loss coverage kicks in to reimburse the employer for any health claim costs that go beyond a pre-determined amount.

16.     Unless exempted, self-funded health benefit plans are governed and regulated by ERISA. Pursuant to ERISA, a self-funded health benefit plan must maintain a written, official plan document that details the plan's terms and conditions, including, *inter alia*, the terms of eligibility and the benefits covered.

17.     Employers that provide self-funded health plans often hire a commercial insurance company to oversee claim processing, claim payments, and other administrative services. These commercial insurance companies are referred to as a Third-Party Administrator ("TPA").

18.     The employer and the TPA typically enter into an Administrative Services Agreement ("ASA"), which sets forth the terms and conditions by which the TPA will administers the employer's self-funded healthcare plan, and also sets forth how the TPA is compensated.

19.     Under some ASAs, the healthcare plan sponsors delegate responsibilities and authority over self-funded healthcare plans to the TPA. These responsibilities include determining eligibility and enrollment for coverage under the healthcare plan, interpreting the provisions of the healthcare plan to make coverage determinations on claims for healthcare plan benefits, conducting a full and fair

review of each claim which has been fully or partially denied, conducting both mandatory levels of appeal determinations for all concurrent, pre-service and post-service claims, and notifying the covered member, or the covered member's authorized representatives, of its decision. Most of these obligations are required of healthcare plan administrators by applicable provisions of ERISA, and routinely classified as duties only an ERISA plan fiduciary may retain.

20.     Upon information and belief, the Plan is an ERISA governed welfare benefit plan administered by Defendants for the benefit of its members and beneficiaries.

21.     Upon information and belief, Defendants hired Capital Blue Cross Blue Shield ("BCBS") as the TPA for the Plan by and through one or more ASAs In exchange for the payment of fees, BCBS provides claims processing and other administrative services to the plans, as well as access to BCBS's network of contracted providers. As such, BCBS maintains all claims-related information, and Air Products does not maintain individual claims information, claims review information, claims guidelines, fee schedules or materials associated with claims administration.

22.     Upon information and belief, and in connection with the healthcare claims made subject of this action, BCBS functioned as the Plan's "plan administrator," as that term is defined under ERISA. Accordingly, BCBS assumed all obligations imposed by ERISA on plan administrators. Additionally, as alleged herein, BCBS also acted as the Plan's co-fiduciary.

**B.      Overview of In-Network and Out-of-Network Healthcare Providers**

23.     Healthcare providers, like Plaintiffs, are classified as either "in-network" or "out-of-network." In-network medical providers have contractually agreed with health insurance companies to accept pre-determined and heavily discounted rates for healthcare services furnished to insured members and beneficiaries. In-network providers agree to these lower reimbursement rates in exchange for a higher volume of patients, which is commonly referred to as "steerage."

24.     When a plan member or beneficiary receives health care services from an in-network provider, the Plan is only obligated to pay the in-network provider the negotiated amount set in the contract's fee schedule. In-network providers also contractually agree to not "balance bill"[1] the patient for any difference between the provider's billed charges and the negotiated fee schedule rate.

25.     Conversely, out-of-network medical providers have not contractually agreed to accept pre-determined rates for healthcare services, and also do not receive any "steerage." Such providers are free to "balance bill" the patient for amounts left unpaid by the plan.

26.     The Plan expressly allows its members and beneficiaries to receive and obtain reimbursement for health care services from his or her provider of choice, including out-of-network providers. The members and beneficiaries paid additional premiums in exchange for this right.

27.     The Plan is required, under its own terms and conditions, ERISA, and applicable law, to pay covered out-of-network benefits promptly and correctly.

28.     Further, upon information and belief, the Plan is required to promptly pay these "Covered Expenses" based upon the usual, customary and reasonable rate ("UCR") for that service in the same geographic area as the out-of-network provider. The failure or refusal to pay the full UCR amount under the Plan's terms and conditions is an adverse benefit determination, as that term is understood under ERISA.[2]

29.     Pertinent to the healthcare claims forming the basis for this action,[3] Plaintiffs operated out-of-network ambulatory surgical centers that furnished healthcare goods and services to members

---

[1] In basic terms balance billing, sometimes also called extra billing, is an industry term that refers to an out-of-network provider billing the patient for the difference between the reimbursement amount and the provider's billed charge.

[2] The definition of "adverse benefit determination" under ERISA claims procedure includes "a denial, reduction, or termination of" benefits, which can even result with a "failure to provide or make payment (in whole or in part) for" a medical benefit claim. 29 C.F.R. § 2560.503-1(m)(4).

[3] Plaintiffs have prepared a confidential document entitled "Description of Claims," which includes confidential and statutorily protected personal healthcare information. The Description of Claims contains the patients' first and last names, dates of serve, the Document Control Number ("DCN") associated with that patient's claim, the policy number, the group number, the CPT code billed for the patient's corresponding date of service, the modifier corresponding to the CPT code,

and beneficiaries covered under the Plan. The Plan's language explicitly covers ambulatory surgical center expenses. As an out-of-network provider, Plaintiffs had no written contracts with Defendants or BCBS, and are therefore not subject to any of the contractual limitations included in such contracts.

## C.     Fiduciary Duties Imposed by ERISA

30.     ERISA imposes fiduciary duties on individuals or entities who exercise discretionary control or authority over Plan management and/or Plan assets, have discretionary authority or responsibility for the Plan's administration, provide investment advice to a Plan for compensation, or have any authority or responsibility to do so. Plan fiduciaries include, but are not limited to, Plan trustees, Plan administrators, and members of the Plan's investment committee.

31.     ERISA requires that these fiduciaries run the Plan solely in the interest of the Plan's members and beneficiaries, and for the exclusive purpose of providing benefits and paying plan expenses. Fiduciaries must follow the terms of Plan documents to the extent that the Plan's terms are consistent with ERISA. ERISA dictates that the Plan must be interpreted and implemented solely in the best interests of the Plan's beneficiaries. 29 U.S.C. §§ 1104(a)(1)(B) and (D).

32.     Fiduciaries must also avoid conflicts of interest, and not engage in various prohibited transactions. Stated simply, under 29 U.S.C. §1106, ERISA fiduciaries may not engage in transactions on behalf of the Plan that benefits related parties, services providers, or the plan sponsor.

33.     Fiduciaries who violate these principles of conduct may be held personally liable for Plan losses, and must disgorge profits made through improper use of Plan assets. ERISA empowers courts, through 29 U.S.C. § 1109, to take whatever remedial action is appropriate against fiduciaries who breach their duties, including their permanent removal.

---

the billed amount, and the paid amount. Plaintiffs will furnish a true and correct copy of the Description of Claims to the Plan's counsel of record upon the entry of a suitable protective order.

34. BCBS also acted as a fiduciary because it exercised authority and/or control respecting the management of the disposition of the Plan's assets, and/or had authority or responsibility in the administration of the Plan.

35. Defendants knowingly endowed BCBS with discretionary authority and control over the claims administration of the Plan, which includes the adjudication of claims, handling the "full and fair review" of appealed claims, determining coverage and reimbursement amounts, and the payment of claims from the Plan's assets. The exercise of discretion in the determination of Plan benefits is an inherently fiduciary function under ERISA.

36. Therefore, Defendants and BCBS, the Plan's designated administrator and agent, jointly served as co-fiduciaries for the Plan. As such, Defendants and BCBS owed the covered members and beneficiaries the obligation to act prudently, with the care, skill, prudence, and diligence that a prudent administrator would use in the conduct of an enterprise of like character.

**D.  Overview of the Patient Registration Process & Assignment of Benefits**

37. Prior to furnishing health care services to patients, it was Plaintiffs' custom and practice to have each patient sign various forms acknowledging his or her understanding of personal financial responsibility for the amounts charged by Plaintiffs, and that he or she remained fully obligated for all uncovered portions of the claims. By signing these forms, each patient agreed to be "legally responsible for any and all actual total charges expressly authorized by me regardless of any applicable insurance or benefit payments," and was "personally responsible for [Patient's] account balance regardless whether or not if your insurance will pay for your total balance of your claims."

38. It was also Plaintiffs' custom and practice to obtain an assignment of benefits and designation of authorized benefits (hereinafter the "assignment of benefits"). Each of the individuals identified in the Description of Claims signed an assignment of benefits stating:

> In considering the amount of medical expenses to be incurred, I, the undersigned, have insurance and/or employee health care benefits coverage with the above

captioned, and hereby assign and convey directly to the above named healthcare provider(s), as my designated Authorized Representative(s), all medical benefits and/or insurance reimbursement, if any, otherwise payable to me for services rendered from such provider(s), regardless of such provider's managed care network participation status. I understand and agree that I am legally responsible for any and all actual total charges expressly authorized by me regardless of any applicable insurance or benefit payments. I hereby authorize the above-named provider(s) to release all medical information necessary to process my claims under HIPAA. I hereby authorize any plan administrator or fiduciary, insurer and my attorney to release to such provider(s) any and all plan documents, insurance policy and/or settlement information upon written request from such provider(s) in order to claim such medical benefits, reimbursement or any applicable remedies. I authorize the use of this signature on all my insurance and/or employee health benefits claim submissions.

I hereby convey to the above named provider(s), to the full extent permissible under the laws, including but not limited to ERISA §502(a)(1)(B) and §502(a)(3), under any applicable employee group health plan(s), insurance policies or public policies, any benefit claim, liability or tort claim, chose in action, appropriate equitable relief, surcharge remedy or other right I may have to such group health plans, health insurance issuers or tortfeasor insurer(s), with respect to any and all medical expenses legally incurred as a result of the medical services I received from the above named provider(s), and to the full extent permissible under the laws to claim or lien such medical benefits, settlement, insurance reimbursement and any applicable remedies, including, but are not limited to, (1) obtaining information about the claim to the extent as the assignor; (2) submitting evidence; (3) making statements about facts or law; (4) making any request, or giving, or receiving any notice about appeal proceedings; and (5) any administrative and judicial actions by such provider(s) to pursue such claim, chose in action or right against any liable party or employee group health plan(s), including, if necessary, bring suit by such provider(s) against any such liable party or employee group health plan in my name with derivative standing but at such provider(s) expenses. Unless revoked, this assignment is valid for all administrative and judicial reviews under PPACA, ERISA, Medicare and applicable federal or state laws. A photocopy of this assignment is to be considered as valid as the original. I have read and fully understand this agreement.

39.     By executing the assignment of benefits, the covered members and beneficiaries expressly and knowingly assigned to Plaintiffs a broad array of rights relating to their Plan benefits, and also appointed Plaintiffs as their authorized representatives. These rights included the right of Plaintiffs to be paid directly by the Plan, the right of Plaintiffs to challenge and appeal any adverse benefit decision, the right of Plaintiffs to pursue litigation covering all ERISA causes of action (including breach of fiduciary claims), and the right of Plaintiffs to request and directly receive relevant plan documents (Summary Plan Descriptions, Master Plan Documents, Claim Files, Administrative

Files, Financial Reports, among other documents and information). These assignments of benefits were never revoked, are unrestricted, and placed Plaintiffs in the same position as the assignor-patients.

40.     The assignments of benefits conferred standing to Plaintiffs not only as an assignee of the covered members and beneficiaries, but also as a designated authorized representative under ERISA. Accordingly, Plaintiffs have standing to pursue the ERISA counts not only as an assignee, but also as the designated authorized representative of the covered members and beneficiaries.

41.     Plaintiffs did not waive a deductible or co-payment in exchange for the execution of the assignment of benefits.

**E.     Overview of the Pre-Verification Process**

42.     During the Operative Time Period, it was also Plaintiffs' custom and practice to verify the member or beneficiary's coverage and eligibility before furnishing medical goods and services. This pre-verification included confirmation that the Plan covered out-of-network claims, as well as the specific healthcare services to be performed. Plaintiffs' customary practice was to pre-verify coverage and eligibility by calling the telephone number indicated on each covered member or beneficiary's health insurance card, and to annotate each patient's chart accordingly.

43.     Throughout the pre-verification process, Plaintiffs received representations that the Plan covered out-of-network services for each of the patients appearing on the Description of Claims.

44.     When Plaintiffs verified member eligibility and obtained pre-authorization for out-of-network services, neither Defendants nor their agents took the position that the patients were prohibited from assigning claims to Plaintiffs, or took the position that Plaintiffs lacked legal standing to pursue and recover reimbursement for the healthcare claims identified in the Description of Claims.

45.     It was also Plaintiffs' custom and practice to verify that reimbursement for the medical, services would be made at the usual and customary rate for the same or similar medical services in and around Plaintiffs' geographical area.

46. Upon receiving these authorizations and verifications, and in reasonable reliance on them, Plaintiffs provided medical goods services for the members and beneficiaries identified in the Description of Claims. After providing medical goods and services to the patients identified in the Description of Claims, Plaintiffs timely submitted claims for payment, together with all necessary supporting documents and information, in accordance with the procedures established by the Plan.

47. Collectively, the Description of Claims reflect billed charges in the approximate total amount of $480,000. The total approximate aggregate payments for these claims were $40,000, reflecting a total payment percentage of roughly 8%.

**F.      The Wrongful Denial and Underpayment of the Claims**

48. When a claim is processed by an insurance company, it is standard industry practice for that company to issue an Explanation of Benefits ("EOB") to the Provider, which is sometimes also called the Provider Remittance Advice ("PRA").

49. The "EPRA" is an electronic version of the EOB/PRA, which is created from the data transmitted with an Electronic Remittance Advice ("ERA"). Because the EPRA is an electronic version of the EOB, the provider can access the EPRA to obtain claim processing information in order to "auto-post," or record, payments on medical claims into the provider's system. Thus, it is essential that the EPRA provides accurate and truthful information.

50. The ERA, which is a standardized transaction advice pursuant to the Health Insurance Portability and Accountability Act ("HIPAA"), uses various claim adjustment reason codes ("CARC") and/or remittance advice remark codes ("RARC"). These remark codes are intended to communicate information explaining how the claims were processed, adjudicated, and paid.

51. EPRAs/EOBs associated with the Description of Claims repeatedly included in-network CARC/RARC codes, which indicate that claims were processed using in-network pricing

agreements that by definition cannot apply to an out-of-network provider. As such, Defendants did not pay the correct amounts for the claims described in the Description of Claims.

52.     As but one example, some EPRAs mischaracterized Plaintiffs' billed charges as being subject to a "contractual obligation," even though it is indisputable that no such contract exists. These in-network remark codes conveyed a false message that the patient's claim was governed by a PPO contract that prohibited this provider from balance-billing the patient, when in truth, the patient remained personally liable for any amounts charged but not paid by the Plan.

53.     These EPRAs also represented that the patient's financial responsibility was $0.00, and included a statement that "the patient may not be billed" for the remaining owed amount. These statements served to mislead Plaintiffs, the Plan's members and beneficiaries, and were hopelessly inconsistent with the Plan's actual terms and conditions.

54.     The improper use of these remark codes also created havoc with Plaintiffs' billing and accounts receivable departments. Because of these duplicitous remark codes, Plaintiffs could not use the information contained in the EPRA to auto-post payments into Plaintiffs' billing system, as doing so would misstate the accounts receivable balance for both the Plan and the patient. As such, Plaintiffs were forced to adopt far more labor-intensive practices to accurately post account information.

55.     Additionally, Defendants failed to pay the claims promptly. These failures resulted in a direct financial benefit to Defendants and BCBS, and caused direct financial damages to Plaintiffs.

**G.     Overview of the Claim Appeal Process**

56.     When Plaintiffs did not receive appropriate and timely payments, it was Plaintiffs' custom and practice to request explanations for the denials or underpayments, and to also request Plan documents supporting the adverse benefits determinations. During the operative time period, it was also Plaintiffs' custom and practice to, per applicable written instructions, file a claim appeal and/or claim review regarding the underpayments, non-payments, and/or denials. Plaintiffs' custom

and practice was to send a letter and supporting materials (including the assignment of benefits) to the published claim review address via USPS return receipt requested. With regard to the claims identified in the Description of Claims, administrative and claim appeal options were pursued until exhausted, or deemed exhausted due to futility.

57.     It was also Plaintiffs' custom and practice to clearly indicate that it was making these requests in its capacity as the legal assignee and designated authorized representatives of the covered member or beneficiary. Notably, throughout the administrative claim review and/or claim appeal process for the healthcare claims identified in the Description of Claims, neither Defendants nor BCBS referenced or invoked any purported anti-assignment clause, never refused to communicate with Plaintiffs based on any such purported anti-assignment provision, never refused to process any of the claims submitted by Plaintiffs based on any such anti-assignment provision, and never invoked any such anti-assignment provision as a basis for refusing to pay the proper amount due and owing for the healthcare claims.

58.     29 C.F.R. § 2560.503-1(g)(1) requires that the Plan's administrator state, in a manner calculated to be understood by the claimant, the specific reasons for any adverse benefit determination, as well as identify the specific healthcare plan provisions on which the adverse determination was based. BCBS and Defendants, however, failed to provide Plan documents supporting the adverse benefits determinations, and otherwise failed to act in accordance with 29 C.F.R. § 2560.503-1(g)(1).

59.     Defendants and BCBS also failed to provide adequate notice as required by 29 U.S.C. § 1133(1), and similarly failed to provide a reasonable opportunity for "full and fair review" concerning any adverse benefit decision as required by 29 U.S.C. § 1133(2).

60.     Defendants and BCBS also neglected to explain the formulas, methodologies, and/or schedules used to calculate the reimbursement amount for the claims that were at least partially paid. Instead, Defendants and BCBS would provide an opaque "explanation" that the claims were subject

to undisclosed "plan allowances," but failed to divulge the formulas, methodologies, and/or schedules used to determine such the UCR amount. Instead, Defendants and BCBS would provide boilerplate statements that did not include any meaningful description of how the UCR charge was determined.

61. Further, neither Defendants nor BCBS provided a written explanation regarding the above-described remark codes, amongst others, despite the fact that Plaintiffs repeatedly referenced these remark codes in claim appeals and other correspondence.

## H. Factual Summary

62. Plaintiffs furnished medically necessary services and care to the Plan's members and beneficiaries. Plaintiffs took commercially reasonably steps to verify eligibility and to obtain pre-authorization, and Defendants and their agents represented that the Plan covered the medical services to be provided. Plaintiffs justifiably relied on these representations by furnishing valuable medical services to the Plan's members and beneficiaries. Plaintiffs timely submitted conforming claim forms and supporting information, but these claims were either denied or underpaid. Plaintiffs now must institute judicial action to redress the wrongs made subject of this Complaint.

63. Defendants are well aware that, together with their agent and co-fiduciary BCBS, the Plan has been improperly administered. Despite this knowledge, Defendants have refused to take corrective action, and have instead elected to ratify and continue the misconduct rather than redress it. These decisions harmed the Plan's members, beneficiaries, and Plaintiffs; indeed, as a result of Defendants' willful refusal to pay the Plan's benefits, the assignor-patients are personally exposed to financial liability for their unpaid medical bills.

64. Plaintiff has exhausted all of its administrative remedies and has the right to institute judicial action to redress the wrongs complained of in this lawsuit. All conditions precedent to filing this action have been performed, have occurred, or have been waived.

## V. ERISA-BASED CAUSES OF ACTION

### Count 1: Claim to Enforce and Obtain Benefits Under ERISA

65.    Plaintiffs incorporates the allegations contained in the preceding paragraphs as if set forth verbatim herein.

66.    Plaintiffs may recover benefits for the patients identified in the Description of Claims in two different capacities: as assignees of the patient's benefits; and as authorized representatives of the members or beneficiaries themselves.

67.    Count 1 is brought under 29 U.S.C. § 1132(a)(1)(B), in order for Plaintiffs recover benefits due, to enforce their patients' rights under the terms of the plan, and to clarify the terms and the total payment in relation to the actual benefits; clarification that was supposed to be provided to the patients before, during, and after the medical procedures were performed.

68.    The Plan requires that Defendants pay for out-of-network medical services furnished to its member or beneficiary's.

69.    Neither Defendants nor BCBS has proffered sufficient information to allow Plaintiffs to determine the pricing methodologies employed for these out-of-network claims in a manner calculated to be understood by the covered member, its assignee, or its authorized representative.

70.    Plaintiffs' billed charges reflect usual and customary rates for its geographical area for the medical services rendered to the patients identified in the Description of Claims.

71.    In violation of ERISA, Defendants failed to provide Plaintiffs, as assignee of the patients identified in the Description of Claims, with the benefits afforded under the Plan's terms.

72.    As a proximate result of Defendants' wrongful acts, Plaintiffs have been damaged in the amount in excess of the jurisdictional limits of this Court. Defendants are liable to Plaintiffs for unpaid benefits, interest, attorneys' fees, and other penalties as this Court deems just.

## Count 2: Defendants' Breach of Fiduciary Duties Under ERISA

73. Plaintiffs incorporates the allegations contained in the preceding paragraphs as if set forth verbatim herein.

74. Pursuant to Red. R. Civ. P. 8(d)(2), Plaintiffs brings this count in the alternative to Count 1 to the extent Count 2 is deemed to be based on a duplicative statement of claim.

75. Pursuant to ERISA §502(a)(3) and 29 U.S.C. §1132(a)(3), Plaintiff, as assignee of the patients identified in the Description of Claims, avers that Defendants breached their fiduciary duties in connection with the administration of those claims.

76. As fiduciaries, Defendants owe the Plan's members and beneficiaries, including Plaintiffs as the lawful assignee and authorized representative, a duty of loyalty, defined by ERISA § 406, 29 U.S.C. §1106, as an obligation to make decisions in the interest of beneficiaries, and to avoid self-dealing or financial arrangements that benefit an ERISA fiduciary at the expense of beneficiaries.

77. Defendants granted BCBS broad powers, including the discretion to determine whether plan benefits would be paid, and/or the amount that would be paid to Plan members and beneficiaries. Air Products delegated all claims-related functions to BCBS, and Air Products stated that it did not maintain individual claims information, claim review information, claim guidelines, fee schedules, or other materials associated with claims administration.

78. Upon information and belief, Defendants entered into an arrangement with BCBS under which BCBS's compensation was based, at least in part, upon savings associated with BCBS making reduced benefits payments on behalf of the Plan.

79. The exercise of discretion in determining Plan benefits is an inherently fiduciary function, which must be carried out for the benefit of the Plan's beneficiaries, not to maximize profit by using pretextual and wholly inappropriate reasons to deny and underpay claims. As an example, the above-described remark codes do not appear to bear any connection to the Plan's terms and

16

conditions, and raise serious questions as to whether Defendants ever provided the Plan documents to BCBS. Despite its knowledge of BCBS's misconduct, Defendants enabled, approved, and ratified it, rather than taking corrective action to redress the known breaches of duty committed by their agent, administrator, and co-fiduciary. By doing so, Defendants breached its fiduciary duties.

80.     In violation of ERISA §§ 404(a)(1)(B) and (D), 29 U.S.C. §§ 1104(a)(1)(B) and (D), Defendants breached its fiduciary duty by failing to act with the care, skill, prudence and diligence required by ERISA, by failing to ensure that its administrator and co-fiduciary acted in accordance with the documents and instruments governing the Plan, and by failing to ensure that the Plan's terms complied with ERISA.

81.     The conduct demonstrated throughout this Complaint establishes Defendants' failure to exercise reasonable care towards the Plan's covered members and beneficiaries, and Plaintiffs, as assignee and as the covered beneficiaries and members' authorized representative.

82.     Defendants, together with their agent and co-fiduciary, violated the fiduciary duty of care by underpaying claims without valid data or evidence to substantiate the amount paid, by underpaying and denying claims in an arbitrary and capricious manner, by omitting material information about the claim determinations, and by applying improper discounts to the claims.

83.     Defendants also made, upheld, and ratified systematic misrepresentations about the Plan's actual benefits.

84.     None of these allegations of misconduct implicate the Plan's terms and conditions; indeed, during the claim appeal process, there was no showing that the Plans' terms supported the adverse benefit determination. Additionally, the administration and adjudication of the claims identified in the Description of Claims conflicted with the representations made by Defendants' agent and co-fiduciary during the above-described verification and pre-authorization process.

85.     This conduct not only resulted in an underpayment of these healthcare claims, it impaired the patient's access to out-of-network healthcare coverage, and left them financially exposed for the unpaid amounts.

86.     Defendants are liable for the violations of fiduciary duties described herein, and for violations of its co-fiduciary under 29 U.S.C. §1105.

87.     Accordingly, Plaintiffs request recovery of any other general, equitable, or remedial relief the Court deems just and appropriate, including Defendants' removals as a breaching fiduciary, and prohibition from ever serving as a plan fiduciary under ERISA §502(a)(2) and 29 U.S.C. §1132(a)(2). Accordingly, Count 2 seeks to redress different misconduct than Count 1, and also seeks different remedies.

### Count 3: Defendants' Failure to Provide Full & Fair Review Under ERISA

88.     Plaintiffs incorporates the allegations contained in the preceding paragraphs as if set forth verbatim herein.

89.     Defendants and their co-fiduciary were obligated to provide a "full and fair review" of all claims, but failed to do so. Specifically, 29 U.S.C. § 1133, and its enabling regulations, mandate that Defendants provide a "full and fair review" and make certain disclosures. 29 U.S.C. § 1133 states:

> In accordance with regulations of the Secretary every employee benefit plan shall (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied a full and fair review by the appropriate named fiduciary of the decision denying the claim.

29 U.S.C. § 1133; see also 29 C.F.R. 2560.503-1.

90.     Defendants and their co-fiduciary failed to fulfill their obligation to provide a full and fair review by failing to provide the specific reasons for the adverse benefit determinations, by failing to provide explanations written in a manner calculated to be understood by the covered member, its

assignee, or its authorized representative, by failing to disclose information relevant to the claim appeal process, and by failing to comply with applicable claim appeal procedural regulations. Specifically, the denial letters either gave no explanation as to why the claim was denied or underpaid, gave an explanation that was conclusory in nature, or otherwise made no attempt to provide any rational basis for the denials or underpayments.

91. Plaintiffs, as assignee and authorized representative of the covered members and beneficiaries, requested explanations and documents to support the use of the above-described remark codes, but did not receive adequate explanations or supporting documents.

92. Additionally, Defendants and their co-fiduciary failed to provide sufficient information to adequately inform Plaintiffs, as assignee and authorized representative of the covered members and beneficiaries, of the circumstances, if any, that may have affected the decision-maker's impartiality in rendering its decision (*i.e.,* any financial interests associated with the decision, or any past or present relationship with any party to the review process). This deprived Plaintiffs, as assignee and authorized representative of the covered members and beneficiaries, of a meaningful administrative review, all in violation of ERISA.

93. Further, Defendants and their co-fiduciary failed to provide a full and fair review by not providing documents in response to Plaintiffs' requests. Plaintiffs submitted multiple written requests for copies of documents related to the claims and healthcare plans at issue in this case. Pursuant to 29 C.F.R. 2560.503-l(h)(2), Defendants was required, among other things, to do the following:

(i) Provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;

(ii) Provide that a claimant be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits;

(iii) Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

Defendants and its co-fiduciary failed to fulfill the obligations imposed by 29 C.F.R. 2560.503-l, and therefore failed to provide a full and fair review.

94. Further, the claim review, if any, failed to take into account the documents, medical records, and other pertinent information submitted by Plaintiffs. When Plaintiffs appealed these determinations, they either received no explanation for the adverse determinations, or received a conclusory explanation that frequently consisted of one to two sentences indicating that Defendants were maintaining the prior decision.

95. As a proximate result of these wrongful acts, Plaintiffs have suffered a concrete injury, and request any and all general, equitable, or remedial relief the Court deems just and appropriate.

**Count 4: Penalties for Defendants' Failure to Provide Information**

96. Plaintiffs incorporates the allegations contained in the preceding paragraphs as if set forth verbatim herein.

97. 29 U.S.C. § 1132(c) provides penalties associated with a Plan's refusal to supply required information. 29 U.S.C. § 1132(c)(l)(B) provides:

Any administrator who fails or refuses to comply with a request for any information which such administrator is requited by this subchapter to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) by mailing the material requested to the last known address of the requesting participant or beneficiary within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper. For purposes of this paragraph, each violation described in subparagraph (A) with respect to any single participant, and each violation described in subparagraph (B) with respect to any single participant or beneficiary, shall be treated as a separate violation.

98.     29 U.S.C. § 1024(b)(4) states, in part, "The administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description, and the latest annual report, any terminal report, the bargaining agreement, trust agreement, or other instruments under which the plan is established or operated."

99.     Plaintiffs, in their capacity as the assignee and authorized representative of the covered members and beneficiaries, made written requests for information to Defendants' and its co-fiduciary; therefore, Plaintiffs have standing to pursue all protections afforded to the covered members and beneficiaries by ERISA.

100.    Defendants and their agent failed to comply with Plaintiffs' request for information. 29 U.S.C. § 1133 and 29 C.F.R. 2560.503-1(h)(5) provides a civil penalty in the amount of $100 per day for such failure and refusal to provide the requested documents. Plaintiffs, in its capacity as the patient's lawful assignee, suffered a concrete injury to the same extent as the patients identified in the Description of Claims, and therefore have standing to recover this civil penalty.

101.    Plaintiffs also suffered a concrete injury in their own capacity. Plaintiffs were the authorized representatives of the patients identified in the Description of Claims, and Plaintiffs expended valuable time and money attempting to use ERISA's administrative remedies to redress the above-described invalid adverse benefits determinations. Defendants' failure to provide information made meaningful claim appeals impossible, and deprived Plaintiffs, as assignee and authorized representative of the covered members and beneficiaries, of a meaningful administrative review.

102.    Defendants' failure to provide information resulted in Plaintiffs having no choice but to bring this action to obtain these documents, and Plaintiffs bear the expenses associated with bringing this action. As such, Plaintiffs are not only entitled to the requested documents through an appropriate order of this Court, but are also entitled to, in the Court's discretion, the $100 per day civil penalty for each claim at issue in this case.

# VI. STATE LAW CAUSES OF ACTION

## Count 5: Promissory Estoppel

103.     Plaintiffs incorporates the allegations contained in the preceding paragraphs as if set forth verbatim herein.

104.     Plaintiffs brings a claim for promissory estoppel in their own right as out-of-network providers of healthcare services to the Plan's members and beneficiaries. Because it arises from the pre-authorization of, and direct and implied promises to pay for, the healthcare services rendered by Plaintiffs to covered members and beneficiaries, this count does not require interpretation of the Plan. Therefore, count 5 alleges violations of independent legal duties owed directly to Plaintiffs.

105.     As alleged herein, before scheduling any procedure for covered members or beneficiaries, Plaintiffs contacted Defendants, or the contracted agent listed on each member's insurance card, to confirm whether coverage was available for the scheduled services, and to obtain the Plan's specific coverage details for that covered member's scheduled services. Plaintiffs also verified that reimbursement for the medical services would be made at the usual and customary rate for the same or similar medical service in and around Harris County and surrounding counties.

106.     During the pre-verification process, Defendants and/or their agent represented that the out-of-network services to be rendered were covered by the Plan.

107.     By confirming coverage, Defendants and/or their agent made a clear and definite promise to pay Plaintiffs for each of the covered services provided.

108.     These unambiguous promises to pay Plaintiffs created an obligation Defendants owe to Plaintiffs independent of the obligations Defendants owe to the members of the Plan.

109.     Plaintiffs reasonably and detrimentally relied on these representations by performing medical services to covered members and beneficiaries.

110.     Plaintiffs' reliance on these representations was foreseeable to Defendants and/or their agent. The purpose of Plaintiffs' verification confirmation calls was to obtain Defendants' assurance that the medical services to be provided were covered by the Plan. Defendants, who are in the business of administering the Plan, understood this fact, and knew, or should have known, that Plaintiffs would rely on the representations regarding eligibility, coverage, and payment by performing medical services.

111.     Plaintiffs' reliance upon these representations was detrimental to Plaintiffs' business operations, cash flow, and overall practice management. Specifically, and without limitation, Plaintiffs' relied on the above-described representations by negotiating each member or beneficiary's payment plan for the out-of-network services to be rendered based on the information communicated by Defendants and its agents. Had Plaintiffs received truthful and accurate information, Plaintiffs would have made different financial arrangements before the procedures were scheduled and services were provided (*i.e.*, requiring that the patients pay for the procedure in full).

112.     After providing services to covered members and beneficiaries, Plaintiffs submitted claims to Defendants for payment of benefits.

113.     Despite its obligation to pay each claim, Defendants have failed, and continues to fail, to pay Plaintiffs consistent with the representations described herein.

114.     Injustice can only be avoided by enforcing the promises and assurances made by Defendants and their agents. Accordingly, Defendants are required to pay benefits consistent with these representations.

115.     As a proximate result of its reliance on Defendants' unambiguous promises, Plaintiffs have been harmed in an amount in excess of the jurisdictional limits of this Court.

## Count 6:  Quantum Meruit

116.    Plaintiffs incorporates the allegations contained in the preceding paragraphs as if set forth verbatim herein.

117.    Plaintiffs bring this claim in their own right rather than as assignees of the covered members' rights, or as the authorized representative of the covered member or beneficiary.

118.    This count does not depend on or require interpretation of the Plan because it arises from the Defendants' pre-authorization of, and direct and implied promises to pay for, the healthcare services rendered by Plaintiffs to covered members and beneficiaries and, therefore, alleges violations of independent legal duties owed directly to Plaintiffs.

119.    Before providing services to a covered member or beneficiary, Plaintiffs informed Defendants and/or their agent that the member or beneficiary was scheduled for certain medically necessary healthcare services. Plaintiffs requested pre-authorization from the Defendants and/or their agent to provide the healthcare services at issue. Defendants and/or the Defendants' agents provided Plaintiffs with authorization to provide the services to the covered member or beneficiary.

120.    Defendants, either directly or through their agents, agreed to pay Plaintiffs directly for the services they provided to the covered members and beneficiaries. Furthermore, when Plaintiffs called the Defendants and/or the Defendants' agents to verify their patients' coverage, they also asked whether they would pay Plaintiffs' reasonable and customary fees for their services. Defendants and/or the Defendants' agents confirmed they would do so.

121.    Accordingly, Plaintiffs and Defendants understood that, by providing medical necessary healthcare services, Plaintiffs would be paid usual, customary, and reasonable rates for the services provided.

122.    In reasonable reliance on such representations, Plaintiffs furnished valuable medical services and materials to the covered members and beneficiaries. But for these representations,

Plaintiffs would not have provided the medically-necessary services using the payment arrangements that Plaintiffs negotiated with the various members and beneficiaries.

123. Defendants' authorizations, together with the overall course of conduct between the parties, created an implied agreement whereby Defendants promised to pay for medical services furnished to the Plan's covered members or beneficiaries.

124. Defendants accepted, used, enjoyed, and benefited from Plaintiffs' provision of valuable healthcare goods and services. Defendants benefited because Plaintiffs' provision of these out-of-network healthcare goods and services discharged and satisfied Defendants' obligations to provide out-of-network coverage for the Plan's members. Further, Defendants obtained a direct financial benefit by not having to contribute additional monies to the Plan's fund to pay for the medically necessary services provided by Plaintiffs. Further, Defendants knew that Plaintiffs were providing the services for the benefit of Defendants.

125. As described herein, Defendants had reasonable notice that Plaintiffs expected compensation for the above-described services and materials.

126. Defendants have failed and refused to timely and properly pay Plaintiffs for the reasonable value of their services provided to the covered members and beneficiaries. Instead, Defendants have delayed payment, denied payment, and/or paid whatever amount their agent and co-fiduciary arbitrarily decided was appropriate for such services, all at rates far below the services' reasonable value. As a result, Defendants, which accepted the benefit of the medical services furnished to covered members and beneficiaries as well as the insurance premiums from covered members and beneficiaries in exchange for out-of-network healthcare coverage, have been unjustly enriched.

127. The reasonable value of the services provided by Plaintiffs to the Plan's members and beneficiaries are Plaintiffs' billed charges for the services.

128. Plaintiffs have demanded on numerous occasions that Defendants pay for these healthcare services, and have objected to the Defendants' failure to timely and properly pay for the services provided to the members and beneficiaries.

129. Accordingly, there is now due, owing, and unpaid from Defendants to Plaintiffs an amount to be proven at trial, plus applicable statutory interest.

## Count 7: Negligent Misrepresentation

130. Plaintiffs incorporates the allegations contained in the preceding paragraphs as if set forth verbatim herein.

131. Plaintiffs brings a claim for negligent misrepresentation in their own right as out-of-network providers of healthcare services to the Plan's members and beneficiaries. This count does not require interpretation of the Plan because it arises from the negligent representations made directly to Plaintiffs by Defendants and their agent in connection with the claims made subject of this case. Therefore, count 7 alleges violations of independent legal duties owed directly to Plaintiffs.

132. It was foreseeable that Plaintiffs would rely upon the above-mentioned misrepresentations. It is common practice in the health care industry for TPAs or Plan administrators to assure out-of-network healthcare providers that they will be reimbursed for services provided to the covered member and beneficiaries prior to the rendition of those services. During the operative time period, this foreseeability was reinforced when Defendants received Plaintiffs' claims for the pre-authorized services, and continued to make representations regarding eligibility and coverage on an ongoing basis.

133. Defendants were well aware of the facts and circumstances surrounding Plaintiffs' requests to provide services to covered members and beneficiaries. When Plaintiffs called Defendants or their agents to verify insurance coverage, they asked Defendants or their agents if the Plan provided out-of-network benefits for the scheduled medical services. Defendants' representatives confirmed

and represented that the patients were members or beneficiaries of the Plan, that the Plan covered the specific medical services to be rendered by Plaintiffs, and that Plaintiffs would directly receive payment for these medical services.

134. During these calls, Plaintiffs further inquired whether Defendants would pay Plaintiffs' usual and customary charges. Again, Defendants' representative confirmed Defendants would pay the usual and customary fees charged by the Plaintiffs for the specified services. These confirmations were either communicated orally or in writing.

135. For healthcare services that Defendants indicated required pre-authorization, Plaintiffs further sought, and received, such pre-authorization before providing services to the covered member or beneficiary. Plaintiffs obtained these pre-authorizations from Defendants or Defendants' agent(s).

136. For medical services that Defendants indicated did not require pre-authorization, Plaintiffs relied on direct representations that no express pre-authorization was required for Plaintiffs to be paid for providing the services to the covered member or beneficiary.

137. Defendants intended that these representations would be acted upon by Plaintiffs and/or knew that, after telling Plaintiffs the services were authorized, or that no pre-authorization was necessary, Plaintiffs would provide these medical services to the covered members and beneficiaries.

138. Plaintiffs reasonably relied on the representations that the services were authorized, or that no pre-authorization was needed, by performing the medical services.

139. Defendants or their agents made these representations to Plaintiffs in the course of Defendants' business, or in a transaction in which Defendants had a pecuniary interest. Specifically, and without limitation, Defendants have a pecuniary interest in these transactions inasmuch as Plaintiffs' provision of these out-of-network healthcare goods and services discharged and satisfied Defendants' obligations to provide out-of-network coverage for the Plan's members. Further,

Defendants had a pecuniary interest inasmuch as it did not have to contribute additional monies to the Plan's fund to pay for the medically necessary services provided by Plaintiffs.

140.　Defendants or their agents made these negligent misrepresentations for the guidance of others, including Plaintiffs.

141.　Defendants or their agents did not exercise reasonable care or competence in obtaining or communicating the information alleged herein.

142.　Defendants or it agents made these negligent misrepresentations without reasonable grounds for believing them to be true or accurate. Specifically, and without limitation, neither Defendants nor their agents apparently bothered to read the Plan's terms before making these negligent misrepresentations.

143.　Plaintiffs likewise reasonably and actually relied on Defendants' statements that it would pay Plaintiffs' reasonable and customary charges. In reliance on these representations, Plaintiffs rendered medical services to the patients and did not seek alternative potential sources of payment. Had Plaintiffs known the truth, they would not have rendered the services to Defendants' participants and beneficiaries, or would have made alternative financial arrangements.

144.　As a proximate result of Defendants" negligent misrepresentations, Plaintiffs have been harmed in an amount in excess of the jurisdictional limits of this Court.

## VII.  ATTORNEYS' FEES

145.　Plaintiffs incorporates the allegations contained in the preceding paragraphs as if set forth verbatim herein.

146.　Plaintiffs have repeatedly presented claims to Defendants and/or their agent demanding payment for the above-described healthcare services. More than 30 days have passed since those demands were made, but Defendants have failed and refused to pay Plaintiffs. As a result of Defendants' failure to pay, Plaintiffs have been required to retain legal counsel to prosecute this action.

Plaintiffs are therefore entitled to recover reasonable attorneys' fees for necessary services rendered in prosecuting this action, as well as any subsequent appeals.

147. Plaintiffs are entitled to an award of attorneys' fees on its ERISA claims. See 29 U.S.C. § 1132(g)(l) *See Hardt v. Reliance Std. Life Insurance. Co.*, 130 S.Ct. 2149, 2152 (2010); *see also Baptist Mem. Hosp. - Desoto, Inc. v. Crain Auto., Inc.*, 392 Fed. Appx. 289, 299 (5th Cir. 2010).

148. Plaintiffs are also entitled to an award of attorneys' fees pursuant to Texas state law. Plaintiffs have presented claims to Defendants demanding payment for the value of the above-described services. Defendants have failed and refused to pay Plaintiffs more than 30 days after the demands were made pursuant to the Texas Civil Practices and Remedies Code section 38.001. As a result of Defendants' failure to pay these claims, Plaintiffs was required to retain legal counsel to institute and prosecute this action.

## VIII. JURY DEMAND

149. Plaintiffs requests a trial by jury for all claims for which a jury trial is available.

## IX. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully prays that this Honorable Court issue judgment against Defendants granting Plaintiffs the following relief:

i. Actual damages;

ii. Statutory penalties and surcharges as permitted by law;

iii. Recovery of any other general, equitable, or remedial relief the Court deems just and appropriate, including removal of ERISA fiduciaries who are found to have breached their fiduciary duties;

iv. The entry of an Order requiring Defendants to produce and provide the materials and information required by ERISA and its enabling regulations;

v. Attorneys' fees, including attorneys' fees in the event Defendants appeals a judgment issued in this case;

vi. Prejudgment and post-judgment interest at the highest rates allowed by law;

vii.    Taxable costs; and

viii.   Any such other and further relief, legal and equitable to which Plaintiffs may be justly
        entitled.

November 17, 2017
Houston, Texas

Respectfully submitted,

By:     _____/s/_____
        Edwin A. Easterby Attorney-in-Charge
        Southern District of Texas No: 20598
        State Bar No. 00796500
        aeasterby@williamskherkher.com
        Williams Kherkher Hart Boundas, L.L.P.
        8441 Gulf Freeway, Suite 600
        Houston, TX 77017
        Telephone:    713.230.2200
        Facsimile:    713.643.6226

        **ATTORNEYS FOR PLAINTIFFS OPREX
        SURGERY (BAYTOWN) L.P., OPREX,
        OPREX SURGERY (BEAUMONT), L.P
        OPREX SURGERY (HOUSTON), L.P**